UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION



| | | |
|---|---|---|
| William David Jones | ) | 1 March 2022  3:22CV118-MHL |
| *Plaintiff* | ) | |
| *Pro Se* | ) | EEOC Docket 430-2020-00107X |
| | ) | |
| v. | ) | DCMA Agency File PH 19-0058 |
| The Honorable Lloyd J. Austin, III | ) | |
| Secretary of Defense | ) | |
| United States Department of Defense | ) | |
| | ) | |
| Defense Contract Management | ) | |
| Agency | ) | |
| | ) | |
| -- and -- | ) | |
| | ) | Plaintiff's Appeal Based on EEOC |
| Defense Logistics Agency | ) | Administrative Judge's Decision |
| *Agencies* | ) | Dated 7 December 2021 |

**Plaintiff's Appeal Based on EEOC Administrative Judge's Decision**

**Dated 7 December 2021**

## *I.* **Dismissal by EEOC Administrative Law Judge**

***I.1.*** This matter before the United States Federal District Court, Eastern District of Virginia, Richmond Division, concerns the dismissal of the complaint by the administrative law judge that the plaintiff filed with the Defense Contract Management Agency (hereto referred to as "DCMA")

Equal Employment Opportunity Office in April of 2019 after DCMA hiring manager, Mr. Christopher Borek, interviewed plaintiff, selected plaintiff, and then both approved and revoked the job offer made to the plaintiff on 25 March 2019.

*I.2.*     On 7 December 2021, the EEOC administrative law judge (ALJ), after having shelved the plaintiff's case from July of 2020 to October of 2021, denied the plaintiff a hearing in his decision. The ALJ awarded summary judgement to DCMA and dismissed the plaintiff's request for a hearing and his motion for summary judgment against DCMA.  In his decision, the ALJ not only vilifies the plaintiff, but makes outrageous claims that his decision granting DCMA summary judgment was "well-deserved" since –

> "Based on the overwhelming weight of the evidence in the record, it is beyond any
> reasonable dispute that Complainant engaged in significant misconduct while at
> DLA and Mr. Wait's statement to Mr. Borek on March 25, 2018 [*sic*], which led
> Mr. Borek to withdraw the TJO was both justified and truthful." [*See* Footnote 12,
> ALJ decision, EEOC Docket 430-2020-00107X, 7 December 2021]

*I.3.*     At no point in his decision does the ALJ consider the plaintiff's requests for the opportunity to introduce additional, crucial facts and evidence discovered between July 2020 and October of 2021 relevant to the complaint that would, ultimately, demonstrate that the accusations made by the plaintiff's former supervisor at DLA were not only false, but *proven* false by investigative documents from DLA that were available *before* Mr. Borek made his decision *and which Wait was fully aware of* – documents that cleared the plaintiff of all accusations Wait and others had made. The ALJ refused the plaintiff the opportunity to introduce this most relevant evidence.  The ALJ argues that the plaintiff is "out of time," completely ignoring the time the complaint idled from July 2020 to October of 2021, *and* that the ALJ had made promise after promise to hear the case

by August of 2021, only to delay inexplicably until December of 2021, after the plaintiff submitted several e-mails to the ALJ's supervisory judge. The ALJ vividly expresses personal irritation towards the plaintiff after the plaintiff responds to an e-mail from the ALJ claiming that he did not send the DCMA representative an e-mail ordering DCMA to reply to the plaintiff's e-mail requests. Furthermore, the ALJ devotes almost a full page in his 12-page decision to *grammar lessons* which have absolutely no bearing on the evidence, merits, or arguments before him, instead defending why "Please feel free to respond to Mr. Jones' e-mails" is (according to the ALJ) *not* written in the imperative verb mood and therefore *not* a directive or order. The ALJ has lost all objectivity in the complaint, and his ire is readily apparent. The ALJ ruled not on the merits of the evidence, but on personal bias and emotion.

*I.4.*     The ALJ graphically displays his ire and eschews his very personal feelings against the plaintiff, deeply railing against the plaintiff in nearly every page of his decision. This ALJ is not displaying the impartiality required of his office; instead, this judge is displaying complete and utter disrespect, contempt, and a lack of professional courtesy towards the plaintiff. The ALJ acts inappropriately and has lost all objectivity. The plaintiff has no choice but to appeal this matter, but certainly not with the EEOC.

*I.5.*     The ALJ made no use of the evidence presented by the plaintiff in his decision. Nowhere does he reflect upon the plaintiff's evidence referenced in the investigative file except to draw his own prejudicial, biased conclusions favoring DCMA. The ALJ rendered his less-than-factually-based decision on the highly prejudicial and unsubstantiated evidence obtained in violation of the plaintiff's Constitutionally-protected, due-process rights by DLA in its response to the plaintiff's filing in the Federal District Court [See 3:21cv00288MHL, Jones v. DLA (short title)], plus the aforementioned State civil case removed by the United States District Attorney for the Eastern

District of Virginia in December of 2019.]   Notably and most egregiously, the ALJ *agreed* that the Federal case is still pending and had not been heard or ruled on.   The ALJ should address the facts found in the investigative file, not the yet-to-be-heard case before a Federal Judge.   The ALJ absolutely has displayed unanimous and deferential bias towards the agencies and *taunts* the plaintiff by writing that the *Agencies' (PLURAL)* overwhelming evidence is indisputable, absolute, factual, incontrovertible, and irreversibly damning.   Plaintiff cannot fathom how an ALJ can be so incredibly biased and think that his decision will not be challenged.

*I.6.*      Another piece of undisputed evidence ignored by this ALJ is that the plaintiff applied to and was selected for two other Federal jobs, one for the United States Army as an Operations Research Analyst working at Fort Belvoir, Virginia, in April of 2019 and the second for the United States Marine Corps working as an Operations Research Analyst at Marine Corps Base Quantico in August of 2020 (note that the plaintiff has worked in this position since October of 2020).   These same Agencies conducted the same background checks on the plaintiff as DCMA, and the plaintiff was found fit for duty by the Department of Defense by *both* DoD components.   The ALJ dismissed these facts which are not only relevant, but deterministically and categorically *proves* that the plaintiff was *not* an "insider threat."   Under 32 CFR 2004.24, if any allegation is proven true, then the guilty party at a minimum would have had his / her security clearance revoked.

*I.7.*      Conspiracy is not among the laws that the EEOC is charged to examine as part of its charter under 29 CFR.   Therefore, the plaintiff must find the proper venue in which to introduce evidence that can be heard in an appropriate court.   Appealing the EEOC administrative judge's decision to the EEOC would only prolong this case.   The plaintiff received evidence of a conspiracy and plans to introduce it in this court.   DCMA is not the only source of this conspiracy.   By means of a carefully crafted and executed set of plans, the actions of certain employees at the Defense

Logistics Agency (hereto referred to as "DLA") directly contributed to the revocation of the job offer from DCMA; therefore, DLA is being called as co-defendant. The plaintiff must file this complaint in this court in order to seek proper consideration, and, if successful, proper relief.

*II.* **Plaintiff Prays That This Court Hears and Considers These Violations of Law**

The plaintiff has provided sufficient background and now presents the following issues for this court to consider:

(A) Whether or not the actions taken by DCMA and DLA employees violated the plaintiff's Constitutional rights under the Fourth, Fifth, and Fourteenth Amendments as well as the Privacy Act of 1974;

(B) Whether or not the actions taken by both DCMA and DLA employees violated Federal laws, notably 5 USC 702 – 706, 18 USC 245, 18 USC 371, 18 USC 1001, 18 USC 1030, 18 USC 1621, 18 USC 1623, 28 USC 1746, and 32 USC 2004.24; and,

(C) Whether or not those actions constitute a civil and possibly criminal conspiracy.

**1. Timeline of Events**

*1.1.* Plaintiff originally filed an EEO complaint alleging retaliation (as defined under 29 CFR 1614) after DCMA revoked the job offer made on 25 March 2019. The plaintiff discovered on 5 April 2019 that DCMA's selecting official, Mr. Christopher Borek, had contacted employees at the Defense Logistics Agency in violation of the plaintiff's expressed wishes and the Office of Personnel Management's (OPM's) rules and regulations governing references as part of the hiring process [See OPM's Publication On Hiring Practices]. However, Mr. Borek provides two conflicting stories in his testimony:

(1)  He attempted to discuss the plaintiff's knowledge and application of artificial intelligence with a former DCMA employee who worked at DLA, plus the plaintiff's former DLA supervisor.

(2)  He sought out an unsanctioned, additional reference from the plaintiff's former supervisor (having discussed and obtained permission from a human resources employee and *not* from the applicant / plaintiff).

*1.2.*      Plaintiff applied to a GS 1515 13-level Operations Research Analyst under USAJobs Announcement SWH819PH3435562927, was interviewed twice, and was selected for the position at DCMA headquarters located at Fort Lee, Virginia, during the approximate period between January and March of 2019.   The selecting panel scored the plaintiff (a 10-point, service-connected, disabled veteran) as their top choice, and indicated their selection to the selecting official.  Mr. Christopher J. Borek, assigned to Headquarters, DCMA, was that selecting official. Mr. Borek agreed with the selecting panel, and asked the plaintiff to submit a list of three, professional references after the first interview to which the plaintiff agreed and provided.  The three references were people the plaintiff had worked with and known for between three and twenty years; none had ever been the plaintiff's supervisor, a fact the plaintiff established with the selecting official.   When asked why the plaintiff did not provide his former supervisor as a reference, the plaintiff explained to the selecting official that including him as a reference would not be appropriate, as we had certain unresolved differences.  In addition, OPM does not require references be from supervisors or former supervisors.

*1.3.*      The plaintiff was under no obligation to define further what those differences were to the selecting official, nor was the plaintiff required by any law or statute to inform the selecting official that he had filed an EEO complaint against DLA.  The Privacy Act of 1974 applies to active, ongoing EEO investigations; at the time of the interview selection, the plaintiff had an active EEO

investigation against DLA (EEO Case File DLAR 19-0036). However, on or about 1 April 2019, in an e-mail to Ms. Jaclynn Spears (Army Servicing Center, Fort Riley), the plaintiff *voluntarily* provided information that he *had* filed an EEO complaint against DLA.

*1.4.*    After the first interview, the selecting official contacted each of the plaintiff's references. The selecting official announced that the plaintiff would be interviewed a second time. The panel members asked detailed questions about the plaintiff's background, and the selecting official asked if he could contact the plaintiff's references again after the second interview. Plaintiff agreed, and the selecting official contacted those references. However, as plaintiff discovered later, the selecting official disregarded the plaintiff's directive *not* to contact anyone other than the references provided – which is an explicit rule and regulation stated in OPM's Guide to Reference Checking. Plaintiff included this publication as part of his list of exhibits / evidence in filing the complaint with DCMA EEO.

*1.5.*    On 25 March 2019, at 10:29 AM, the agency's human resources representative, Lakesha S. Thomas, located at the Army's Servicing Center at Fort Riley, Kansas, e-mailed the plaintiff a letter offering employment; the plaintiff accepted and sent the hiring manager a thank-you note plus a request to meet in-person; there was no reply. Regardless, the plaintiff received the onboarding credentials through OPM's USA Staffing Office at 12:42 PM the same day, immediately receiving a number of forms required to complete the process. The plaintiff rapidly provided the USA Staffing Office with accurately completed forms, some of which were declared under penalty of perjury. But, as will be shown below, Mr. Borek received information from one of the chief conspirators at about 0930 the morning of 25 March 2019; he had time to withdraw the job offer and notify the plaintiff of his intent, but failed to do so, instead going on annual leave and leaving the "dirty work" to his supervisor.

*1.6.*      From documented testimony, the plaintiff provided Mr. Borek with a list of references after the second interview on 12 March 2019.  At 4:03 PM on 12 March 2019, Mr. Borek contacted a human resources employee (Ms. Jaclynn Spears; a non-supervisory employee who worked at the Army Servicing Center at Fort Riley, Kansas), asking whether or not he could contact the plaintiff's former supervisor.  Mr. Borek included this information in his testimony in DCMA Investigative File PH 19-0058.  Spears, *without asking any questions about the nature of the request*, stated that Mr. Borek could do so.  Mr. Borek could have asked the plaintiff who his former supervisor was, but did not; this deliberate action circumventing the plaintiff is not only suspicious, but forms part of the basis for the charge of conspiracy the plaintiff will address.  Spears is equally accountable for failing to abide by OPM's Rules and Regulations by giving Mr. Borek approval to contact a person not listed by the plaintiff as a reference.

*1.7.*      Armed with this affirmation from Spears, Mr. Borek, *according to his written testimony*, contacted a former DCMA employee (Jesse Rowlands, who at that time worked at DLA) allegedly to discuss the plaintiff's work regarding artificial intelligence.  That employee stated that he was under a "gag order" not to discuss the plaintiff or his roles at DLA, and that Mr. Borek should speak to Mr. John Wait, the plaintiff's former supervisor.  According to testimony from Mr. Borek, Borek made a number of calls and sent Mr. Wait a number of e-mails asking to speak with him regarding the plaintiff.  After not receiving a response, Mr. Borek correctly advanced the job offer on 25 March 2019.

*1.8.*      The plaintiff never identified who his former supervisor was during the hiring process, and did *not* include him in the list of professional references.  The plaintiff also made it *clear* that he did not want the hiring official to contact his former supervisor, which OPM allows.  Furthermore, OPM makes it clear that going outside the list of references is a violation of policy that could

subject the offending agency to possible litigation.  OPM provides ample discussion about the dangers of violating this important restriction, and that discussion includes examples regarding liability for deliberately violating OPM rules as well as consequences arising from false statements.

*1.9.*　　Mr. Borek's testimony includes that he received a telephonic response from Mr. Wait on 25 March 2019 and *after* he had made his selection.  According to Mr. Borek's testimony, he asked Mr. Wait to discuss the plaintiff's knowledge and understanding of artificial intelligence; yet, according to the same testimony, there is no mention of Wait answering this question.  Instead, Wait related that the plaintiff was "an insider threat [as defined under 32 CFR 2204.24], that the plaintiff had written and introduced malicious code into DLA's information technology network [a violation of 18 USC 1030], and that DLA was in the process of banning [Jones] from all DLA spaces."  According to the investigative file, Wait's telephone conversation – *unsupported by any documentation* – was the only basis for Mr. Borek deciding to withdraw the job offer on 25 March 2019 *but not communicated to the plaintiff until 5 April 2019*.  It is also the only information used by Borek's supervisor (Maddux), who in her testimony, stated that DLA could not provide any additional information because of its sensitivity.  However, in her declaration, Maddux never expressed whom she contacted at DLA, what was said, nor what Privacy-Act protected or Law-Enforcement Sensitive, For-Official-Use-Only documents DLA had on file and potentially shared (and possibly violating the Privacy Act of 1974).  What is clear is that *DCMA received no supporting documentation regarding Wait's salacious and defamatory allegations from DLA* on 25 March 2019 or thereafter.  Borek, Maddux, and the Army Servicing Employees at Fort Riley had absolutely no documentation that warranted the revocation of the job offer.  In fact, the Army Servicing Center advanced the job offer, provided the plaintiff with the credentialing required to

complete the hiring process, and the plaintiff submitted all the documentation asked for freely and willingly. Neither DCMA nor the Army Servicing Center had any negative documentation; DCMA acted on impulse, not on facts. If such documentation as an insider threat did exist, as Wait touted and Borek believed, then the following would have been in the record:

*1.9.1.* A violation of the DoD Insider Threat Program defined by 32 CFR 2004.24. 32 CFR 2004.24 provides the following steps if an employee is reported and found to be an insider threat:

(1) The agency receiving an accusation against anyone in its employ would be required to conduct a thorough investigation. If the evidence is clear that the person engaged in illegal activity, there would be a record of said activity. The record could be filed in the employee's official personnel file (EOPF), and certainly discoverable during the hiring process.

(2) The violator's security clearance would, at a minimum, be flagged, an action which could be recorded in the alleged insider threat's EOPF and certainly in the DoD's Insider Threat Database; this document would be discoverable during the hiring process.

(3) The violator's security clearance would be immediately suspended, and recorded in the EOPF; this action not only would be discoverable, but if found true, then the violator would likely be prosecuted by a Federal District Attorney.

(4) The violator would be confronted with the findings and granted a hearing in order to respond to the allegations and suspension. The violator would very likely face prosecution by a Federal District Attorney in Federal Court.

If the violator fails to offer proof or evidence that disputes and ultimately defeats the accusation, then he or she can be charged with being an insider threat. If convicted of violating this and related Federal laws (for instance, 18 USC 1030), then he or she would be subject to severe fines and

imprisonment.  Bottom line:  if you violate 32 CFR 2004.24, you certainly would not be able to *compete* for a job requiring the public's trust, and you would very likely spend time incarcerated in a Federal penitentiary.

*1.9.2.*   The plaintiff has *never* been charged with any violation of 32 CFR 2004.24 or any other Federal law, and none of the actions described above in *1.9.1.* exists.  Plaintiff has never been incarcerated, charged with being an insider threat, nor found to be an insider threat.  Plaintiff has absolutely no derogatory records in his EOPF; the claims communicated by Wait to Borek are absolutely and irrefutably false, and Wait's statements are a violation of 18 USC 1621 – Wait knowingly and deliberately made false statements recorded in more than one Federal investigation which he further promoted in his illegal and defamatory interaction with DCMA.

*1.9.3.*   Had the accusations from Wait been true, then the plaintiff could *not* have been hired by either the United States Army at Fort Belvoir in April of 2019 nor by the United States Marine Corps in August of 2020; both DoD agencies have equal access to all sensitive documents about the plaintiff's background.  As a matter of law, the accusations that Mr. Wait promoted must fail, and the plaintiff charges that Mr. Wait has made false statements under penalty of perjury, each meriting a violation of 18 USC 1621 and 18 USC 1623.  As Wait is not the only one who has made these claims, he and others are equally culpable for violating 18 USC 245 (b) (1) (C), 18 USC 245 (b) (4) (A), 18 USC 245 (b) (5), and 18 USC 371.

*1.9.4.*   Wait conspired with another DLA employee, Natalie Clark Seiling (DLA J343), claiming that the plaintiff violated 18 USC 1030, which deals with computer access and other computer-related crimes, an allegation made to Borek when he claimed that the plaintiff wrote and placed malicious code onto DLA's computer network system.  DLA J6 unequivocally proved that this accusation was false in March of 2019.  Seiling provided DLA J6 with the alleged programs; J6

isolated the programs that Seiling claimed contained the code, ran the programs, and examined the code in detail. J6 concluded that the allegations were absolutely false and that the code functioned with one purpose: to advance the day-to-day business of DLA. DLA J6 closed the investigation, clearing the plaintiff. However, Wait continued to promote this false accusation, going as far as including a statement made under penalty of perjury in the investigative file that "[Jones] was *guilty* of having written and placed malicious code on a government computer (and being an insider threat)." These statements violate 18 USC 1621 and 18 USC 1623, as they were knowingly false, damaged the plaintiff's professional and personal reputations, and ultimately cost him the position offered at DCMA. These statements violate 18 USC 245 (b) (1) (C), 18 USC 245 (b) (4) (A), 18 USC 245 (b) (5), and 18 USC 371.

***1.10.*** However, the damage was done. On 5 April 2019 at 9:49 AM, the plaintiff received a scathing e-mail from Ms. Jaclynn Spears at the Army Servicing Center revoking the job offer. The e-mail from the Army Servicing Center claimed that the plaintiff had failed to disclose key information that cast a shadow upon his credibility and trustworthiness. Specifically, the e-mail stated:

> "The tentative job offer is hereby withdrawn due to derogatory information discovered, as well as the lack of being forthright concerning your current circumstances, casts strong concerns with regard to the competency and trustworthiness. For these reasons, the hiring official would like to withdraw this tentative job offer."

The plaintiff, in response, contacted the hiring official by phone, and Mr. Borek took almost 30 minutes to divulge that he had contacted DLA and received negative information (*word of mouth only; no other documentation*) from the plaintiff's former supervisor. These facts are clearly

uncontested and undisputed. Upon receipt of this information, the plaintiff informed the hiring manager that he would be filing an EEO complaint. DCMA's EEO office reviewed the plaintiff's complaint, accepted it, and assigned the docket number, PH 19-0058, to the investigative file.

## 2. DCMA Equal Employment Opportunity Investigative File PH 19-0058

*2.1.* At the end of the conversation with Borek on 5 April 2019, plaintiff filed an EEO complaint with DCMA. DCMA's EEO office received, accepted, and began the process of investigating the complaint. DCMA refused to meet the plaintiff in good faith to reach an agreement during the informal phase; the complaint became formal and was investigated by an independent investigator who adhered to all applicable rules and regulations under 29 CFR 1614, including a request for additional time to complete the formal investigation. Among the hundreds of pages in the investigative file is a series of questions posed to the hiring official, Mr. Borek. Mr. Borek's testimony included the following:

> "During my second interview with Mr. Jones on 12 March 2019, Mr. Jones mentioned that he worked in Artificial Intelligence while at DLA. I have a former employee that works at DLA in Artificial Intelligence (AI), Jesse Rowlands, and I decided to talk to Mr. Rowlands to see if he knew Mr. Jones. I contacted Mr. Rowlands on 13 March 2019. Mr. Rowlands told me he could not speak about Mr. Jones but encouraged me to speak with his former Supervisor, John Wait. *[Note, Mr. Borek includes a footnote at this point which states "I understand that Mr. Jones claims that he instructed me not to contact Wait, his previous supervisor. Mr. Jones never instructed me that I should not speak with Wait."]* I contacted Jaclynn Spears (Spears), my Army Service Team (AST) contact that same day to find out

if there would be any problem with my speaking to Mr. Jones' former supervisor. Spears informed me it was okay to speak with Wait. I placed calls to Mr. Wait on 13 and 14 March 2019. Mr. Wait did not return my calls, so I decided to move forward with the hiring action, because all of the references for Mr. Jones checked out.

Mr. Wait called me the morning of 25 March 2019, the same day the Tentative Job Offer (TJO) went out. During the very brief call, Mr. Wait informed me that Mr. Jones was being investigated by DLA and had been classified as an insider threat. He also informed me that Mr. Jones was responsible for writing malicious code and that DLA was in the process of banning Mr. Jones from DLA and any location where DLA has a presence.

Immediately after speaking with Mr. Wait, I engaged with Pamela Conklin (Conklin), Executive Director of the Financial and Business Operations Directorate. Conklin and I concluded that the Agency should withdraw the TJO. I then met with Roxanne Harding and Human Capital's (HC) Kim Maddux to discuss my next steps. I had no previous experience with withdrawing an offer before this incident, so I was very concerned about doing it correctly. HC informed me repeatedly that I was well within my rights to withdraw the TJO. I was on leave from 1-4 April 2019, and during this time, Conklin finalized the decision to withdraw the TJO.

Also, in my statement to the investigator, I stated that the decision to withdraw the TJO was collectively made by Ms. Maddox, Ms. Harding and myself. In actuality, I, as the Selecting Official, made the decision. Although Ms. Conklin

communicated FB's intention to withdraw the TJO, it was my decision to make.

Also, I now understand that Ms. Maddux and Ms. Harding only advised me as to

my options. The decision to withdraw the TJO was mine and mine alone.

Lastly, I made my decision to withdraw the TJO solely based on the information

that I obtained from Mr. Wait (that DLA had determined that Mr. Jones was an

insider threat). I did not learn that Mr. Jones had filed an EEO complaint against

DLA until we spoke on April 5."

*2.1.1.*  In reading the above statement from Mr. Borek, a reasonable person would begin to formulate a number of questions.  Plaintiff enumerates these questions.

*2.1.1.1.*      If, as Mr. Borek claims, the plaintiff did not instruct him not to contact the plaintiff's former supervisor at DLA, John T. Wait, why did Mr. Borek –

(1)  Not ask the plaintiff directly who his former supervisor was?  Asking directly would have been the fastest way to obtain Wait's name and contact information, but Borek did not take this approach.  Borek claims that the plaintiff "never instructed me not to contact Wait," but Borek's suspicious actions belie this claim.  It is not logical to assume that Borek's statement is true, because logically, Borek had ample opportunity to ask the plaintiff who his former supervisor was.

(2)  Have to contact a human resources employee for advice whether or not he could contact the plaintiff's former supervisor?  This question fails logically.  Mr. Borek has served as a hiring manager in previous hiring actions; there is no need to ask a human resources employee this question.  DCMA has hiring procedures which certainly cover what a manager may or may not do.  DCMA's rules and regulations do not contradict those found within OPM, and OPM has very

specific instructions regarding how to conduct reference checks, contacting former supervisors, and abiding by the expressed wishes of an applicant.

(3) Not follow DCMA's established hiring protocols, specifically DCMA's Business Practice #8 (DCMA Job Offer Withdrawal Procedures)?  The procedures clearly state that documentation *MUST* accompany any allegation that a selectee cannot meet eligibility requirements.  The Army Servicing Center performed the requisite background checks and the plaintiff *CLEARED* those checks – just as he has for both hiring actions since DCMA's withdrawal.

*2.1.1.2.*        Mr. Borek states in one story that he contacted Mr. Jesse Rowlands, a former DCMA employee, about the plaintiff's knowledge of artificial intelligence; the position to which the plaintiff applied does not require nor does not use any form of artificial intelligence as part of the position's duties, a question that both the DCMA EEO chief and the formal investigator asked Mr. Borek.  Mr. Borek confirmed that the position did not require knowledge of artificial intelligence.  Mr. Borek's testimony begins to break down, especially since he also presents a completely different story in other testimony.  Borek's conflicting testimony strongly suggests that Borek has committed perjury (18 USC 1621) and belies the truth: Borek's actions can only be construed as attempting to obtain other, unauthorized reference in violation of OPM's hiring rules, and his painfully enigmatic testimony opens the door to other questions –

(1) If the position did not require the use of artificial intelligence, why did Mr. Borek feel the need to contact any third party about the plaintiff's knowledge of artificial intelligence?

(2) Why did Mr. Borek not ask the *plaintiff* directly to provide additional information about his work on artificial intelligence when he worked at DLA?

(3) Since the position did not require knowledge and use of artificial intelligence, why did Mr. Borek feel the need to ask *any* question about the plaintiff's background regarding artificial intelligence?

(4) Why did Mr. Borek not question / confront the plaintiff with what Mr. Wait claimed?

(5) What documentation did Mr. Borek receive before making the decision to withdraw the job offer on 25 March 2019?  If he received none, then this question requires additional scrutiny, as Mr. Borek's actions now look increasingly convincing that he has engaged in the conspiracy negotiated between Wait and Seiling – a conspiracy to retaliate against the plaintiff which Wait and Seiling had agreed and acted upon.  Mr. Borek willingly participated in this conspiracy and aided its objectives.

*2.1.1.3.*        Mr. Borek provides differing versions of events, specifically stating that he sought out another DLA employee (Rowlands) *and* his former supervisor to discuss the plaintiff's work history without the plaintiff's knowledge and consent.  Borek is on record for having stated that the three professional references the plaintiff provided had "checked out" and that he offered the position to the plaintiff.  Additional references are permitted, but *ONLY* with the consent of the applicant.  Mr. Borek directly violated this rule codified by OPM.

*2.1.1.4.*        Mr. Borek never disclosed to the plaintiff that he intended to ask for additional references or ask additional questions about the plaintiff's background.  Transparency is a guarantee in OPM's hiring practices, but Mr. Borek's (and Mr. Wait's) decisions denied the plaintiff that transparency and solidified the conspiracy between DLA (Wait / Seiling) and Borek. What's more, the ALJ claims in his decision that Borek never knew that the plaintiff had filed an EEO complaint with the DLA; *Wait, however, did know, and he chose not to reveal that*

*information to Mr. Borek.*  Nevertheless, the plaintiff had filed the complaint, which was formal at the time that Borek decided to circumvent OPM's rules and regulations and reached out to Mr. Wait.  *Mr. Borek cannot claim innocence – because he <u>chose</u> to contact Mr. Wait without informing the plaintiff.*  Federal law does not allow for ignorance in creating or aiding a conspiracy; Ms. Seiling and Mr. Wait planned to damage the plaintiff's professional reputation by making outlandish claims that required other Federal employees to investigate and concluding were not true.  They planned the conspiracy, and Mr. Borek embraced it willingly, using the questions and conversations with Spears, Conklin, and Maddux as a means of covering his involvement in accomplishing the goal of the conspiracy.  Mr. Borek's admission that he contacted Mr. Wait is sufficient evidence that he understood what he was doing, that he was willing to take Mr. Wait solely at his word, and take an action against the plaintiff – in this case, the loss of the job offer. Mr. Borek cannot claim that he "knew nothing;" he knew enough to short circuit OPM's and DCMA's rules and regulations.  His refusal to ask the plaintiff about his former supervisor or to inform him that he had spoken with him is also evidence that Mr. Borek was a willing participant in this conspiracy.

**2.1.1.5.**      Mr. Borek's motive is clear:  to have a supervisor's recommendation and reference. At issue is the truth of the reference that Mr. Wait provided and why Mr. Borek, a Federal employee for many years, chose to take the actions that he did.  DCMA has clear guidance and policy regarding the hiring process which mirrors those of OPM.  OPM's and DCMA's policies detail how to ask for and check references; if a prospective employee provides references and they "check out," there is no need for additional references.  If the hiring manager wants more, then the hiring manager *<u>must</u>* ask the applicant for permission, and must state why additional references are

required.  A hiring manager cannot arbitrarily seek an opinion from an unknown third party, and certainly cannot act on it.  Mr. Borek did exactly that.

*2.1.2.*   In Mr. Borek's declaration, he makes it explicitly clear that he contacted Mr. Wait, and that Mr. Wait made extremely specific and damaging statements regarding the plaintiff – statements that were not true and have been proven false.  Among these statements are these two allegations:

> "Mr. Wait informed me that Mr. Jones was being investigated by DLA and had been classified as an insider threat. He also informed me that Mr. Jones was responsible for writing malicious code…" [Borek testimony, Investigative File PH 19-0058]

*2.1.2.1.*        Mr. Wait accused the plaintiff of writing malicious code, which is a violation of Federal Law, specifically 18 USC 1030, but provides absolutely no evidence or proof.  The plaintiff had not worked at DLA since 17 November 2018, DLA had never announced any such violation or investigation, and no entity within the DLA, law-enforcement or otherwise, has ever accused or charged the plaintiff with a violation of any law.  Mr. Wait's accusation is nothing short of defamatory and recklessly libelous.  Borek's response is equally despondent, namely not asking for physical evidence or inquiring with the plaintiff about Wait's accusation.  Just as damaging is the ALJ's conclusion that the *accusation alone* was sufficient cause for DCMA to revoke the job offer (See footnote 12, EEOC Administrative Judge Decision, 7 DEC 2021), completely contradicting the American legal system's position of "innocent until _**PROVEN**_ guilty."  This outrageous and libelous statement created by Mr. Wait and vociferously *defended* by the ALJ was meant to defraud the US Government and the plaintiff from obtaining a position with DCMA.  Mr. Borek, who has years of Federal service, took the bait from Mr. Wait, thereby conspiring with Mr. Wait in accomplishing Mr. Wait's goal.  Furthermore, the ALJ agreed that the "*evidence against*

*the plaintiff proved that the allegations against the plaintiff were true and compelling reasons for DCMA to withdraw its job offer.*"   The ALJ draws his conclusion not based on the evidence that the plaintiff has presented in the EEOC investigative file, but instead is drawing his conclusion based upon filings that the plaintiff has made in the Federal District Court for the Eastern District of Virginia and the United Sates Fourth Circuit Court of Appeals.   The ALJ has completely excreted the evidence the plaintiff has put forth *in toto* and ruled summary judgment for DCMA based on the evidence currently being considered in courts outside of the ALJ's jurisdiction.   This is a blatant disregard for the plaintiff's Constitutional due-process right to introduce evidence and unequivocally demonstrates this ALJ's personal, adamant denial to allow the hear the plaintiff, again violating the Constitutional due-process afforded to every American citizen.   This administrative judge justifies his dismissal and has presumed that the plaintiff's case will be dismissed because, in his own words,

> "Both the Threat Assessment Memorandum and the Commander Directed Inquiry Memorandum relied heavily on text messages, emails, Skype messages, and Facebook posts written by Complainant. To say the least, the messages and posts, which are quoted at length in both memoranda, are – at a minimum – disturbing.
>
> Based on the overwhelming weight of the evidence in the record, it is beyond any reasonable dispute that Complainant engaged in significant misconduct while at DLA and Mr. Wait's statement to Mr. Borek on March 25, 2018, which led Mr. Borek to withdraw the TJO was both justified and truthful."

The ALJ has assumed that the evidence was actually written by the complainant, which has been disputed by the plaintiff in his filing with the Federal District Court and Court of Appeals. Additionally, the Commander Directed Inquiry to which the ALJ refers is dated 8 February 2019

– more than 3 months after the plaintiff had resigned from DLA. The document is completely absent of any evidence from the plaintiff, which is indicative of a conspiracy in and of itself. The ALJ has exhibited substantial prejudice against the plaintiff and has failed to examine the evidence with anything more than cursory scrutiny. He has also assumed that the evidence is indisputable and true, which demonstrates unbelievably personal bias; the evidence has not been tried, and the evidence remains disputed in Federal Court (see 3:21cv00288MHL). The ALJ has made a fatal error in his decision-making process: the plaintiff was not employed by DLA at the time that these allegations were leveled against him, the plaintiff had no knowledge that they were being crafted, and he was illegally barred from making any response – all violations of the plaintiff's Constitutionally-guaranteed due process rights. The ALJ has made critical, substantive, and exceedingly prejudicial errors in making these damning presumptions.

*2.1.2.2.* The term, "insider threat," has been used extensively. It is necessary to describe what is meant by "insider threat." The definition is from 32 CFR 2004.24: *The likelihood, risk, or potential that an __insider__ will use his or her authorized access, wittingly or unwittingly, to do harm to the national security of the United States. Insider threats may include harm to entity or program information to the extent that the information impacts the entity's or agency's obligations to protect classified information.* [emphasis added]

*2.1.2.3.* The plaintiff did not work for any DoD Agency or other entity that would qualify him as an *insider*. DLA accused the plaintiff of being an insider threat well after the plaintiff had been forced to resign. The plaintiff resigned from DLA on 17 November 2018 and was *unemployed* from 17 November 2018 to 28 April 2019. Therefore, the definition of "insider threat" does *not* apply to the plaintiff. There is no indication from DLA that the plaintiff caused harm to the national security of the United States or the protection of classified information. By definition,

the plaintiff is _NOT_ an insider threat.  Yet the ALJ refers to documents meant to harm the plaintiff – and all of those documents are dated well after the plaintiff has resigned.  The idea of a conspiracy to harm the plaintiff is becoming evident.  DLA assuredly had a number of employees who conspired to destroy the livelihood prospects of the plaintiff, going as far as to make the insidious claims in this legal filing.  Had DLA truly considered the plaintiff as an insider threat, DLA would have had him prosecuted under 32 USC 2004.24.  There is nothing – no evidence or proof at all – to indicate that DLA's (Seiling's / Wait's) accusation was in any way truthful.  If DLA were investigating the plaintiff as an insider threat, then Mr. Wait's disclosure to Mr. Borek _could_ have compromised any investigation _and_ violated both DLA's and the plaintiff's Privacy-Act-protected and For-Official-Use-Only, Law-Enforcement-Sensitive Information.  The ALJ's less-than-informed decision regarding this accusation is equally as appalling.  The ALJ not only repeated this accusation, but claimed that there is ample, credible evidence against the plaintiff, and drew a conclusion that the plaintiff is guilty of all accusations.  The ALJ refused to consider any part of the record, a dangerous precedent that violates the plaintiff's Constitutional Fourth, Fifth, and Fourteenth Amendment rights.

### 3.  Violations of Law

_3.1._    In order to show conspiracy under 18 USC 371 and other laws, the plaintiff must show clear and convincing evidence of the following:

(1) **First:**  That two or more persons agreed to defraud the United States.  "Defraud the United States" means to cheat the United States government or any of its agencies out of money or property.  It also means to obstruct or interfere with one of the United States government's lawful functions by deceit, craft, trickery, or

dishonest means.   Employment with the United States is included as a lawful government function, and interfering with an employment action is addressed in 18 USC 245.   This first statute has been met.

(2) **Second:** That (name) was a party to or member of that agreement; Seiling and Wait were the original conspirators, while Borek, Maddux, Harding, Conklin and Spears were each party to this conspiracy.   The second statute has been met.

(3) **Third:** That (name) joined the agreement or conspiracy knowing of its objective to defraud the United States and intending to join together with at least one other conspirator to achieve that objective; that is, that (name) and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal(s) or objective(s), to defraud the United States.   Seiling, Borek, Borek, Maddux, Harding, Conklin and Spears were each party to this conspiracy. Statute three has been met.

(4) **Fourth:** That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objective of the agreement.   The plaintiff was not hired.   The conspiracy accomplished its goal.

*3.2.*     The plaintiff shares the following as evidence of each element above.

*3.2.1.*   FIRST:  The requirement is to show that two or more persons conspired to interfere with one of the government's lawful functions.   The lawful function here was to prevent the hiring action that DCMA had committed in good faith with the plaintiff on 25 March 2019.   The primary conspirators in this case were John T. Wait, the plaintiff's former supervisor, and Natalie Clark

Seiling, a DLA employee who provided Wait with the claims that the plaintiff was both an insider threat and placed malicious code on DLA's computer network system. Mr. Borek advanced these false claims in this hiring action, thereby being party to this conspiracy. Others who contributed to this conspiracy include Jaclynn Spears, the human resources employee at the Army Servicing Center; Pamela Conklin, Executive Director of the Financial and Business Operations Directorate; Roxanne Harding, Human Resources, DCMA; and Kimberly Maddux, DCMA Human Capital.

*3.2.1.1.* Based on the evidence that the plaintiff gathered, Natalie Clark Seiling made the claim that the plaintiff had written and placed code on DLA's information technology network. Seiling made this accusation *after the plaintiff had resigned from DLA* on 17 November 2018. DLA J6 completed an investigation on or about 21 March 2019, more than four months after the plaintiff resigned from DLA, concluding that the programs Seiling claimed contained malicious code actually performed normal DLA business. DLA J6 published its analysis before Wait's conversation with Mr. Borek on 25 March 2019; Wait would have known the results. DLA J6 quashed the accusation regarding the plaintiff being an "insider threat" as defined by 32 USC 2004.24 and 18 USC 1030. Wait refused to believe this assessment from DLA J6, instead promoting his own agenda by extending to Mr. Borek a lie. The ALJ refused to allow this information to be made part of the record when the plaintiff asked in October / November 2021 to include in the record. The ALJ prejudicially erred in making this decision.

*3.2.1.2.* The plaintiff became aware that Seiling and Wait exchanged information about this supposed malicious code in March of 2019 and actively fought the allegation, including filing with the Office of Special Counsel in April of 2019 and requesting assistance via a Congressional Inquiry through the Office of the Honorable Senator Tim Kaine of Virginia. Wait and Seiling, by sharing and promoting this vicious lie, conspired with each other to promote personal and

professional damage to the plaintiff's reputation. DLA J6 performed an internal investigation revealing no malicious code; however, DLA reported two different versions to the Office of the Honorable Tim Kaine that (1) Wait did *not* lie about [Jones] being an insider threat and having written malicious code; and (2) while [Jones] had been exonerated [of violating 18 USC 1030], DLA continued to maintain that [Jones] was guilty of serious misconduct.

*3.2.1.3.* Both versions cannot be true, but DLA advanced both versions to the Office of Senator Tim Kaine in 2019. Seiling and Wait conspired to eschew false information to use against the plaintiff. DLA investigated their outrageous claims and proved them false. Inexplicably, in response to a Congressional Inquiry the plaintiff filed, DLA informed the Honorable Senator Tim Kaine of Virginia in 2019 that "*Wait did not lie*, and that an investigation revealed that [Jones] had placed malicious code onto DLA's computer network." DLA J6 has proven that the claims are true, but the SES in charge of DLA J6 at that time lied to a United States Senator.

*3.2.2.* <u>SECOND</u>: By accepting this information from Wait and failing to act according to OPM's rules and regulations (plus DCMA's own internal policies) regarding hiring practices, Mr. Borek agreed to this conspiracy and agreed to promote its effect against the plaintiff on 25 March 2019. Mr. Borek, without taking the time to analyze or otherwise debate the information Wait provided, *immediately acted to retract the job offer on the same day he offered the plaintiff employment.* Borek's acceptance of this information and subsequent act to withdraw the job offer constitutes an agreement with Wait, thereby satisfying the second requirement establishing a conspiracy. Borek, however, also introduced other federal employees into this quagmire, namely Roxanne Harding, Kimberly Maddux, Pamela Conklin, and Jaclynn Spears.

*3.2.2.1.* In Maddux's own words:

"I have included with my statement a copy of DCMA's Business Practice # 8 (DCMA Job Offer Withdrawal Procedures). Although Business Practice # 8 is not all-inclusive as to why a job offer might be withdrawn, the withdrawal of the TJO in this instance was in accordance with the Agency's Business Practices. Specifically, Business Practice # 8 states that a job offer may be withdrawn based on an applicant's inability to meet all conditions of employment. In this instance, the suitability inquiry revealed adverse information not available to Mr. Borek at the time of his selection (i.e., that DLA intended to ban Mr. Jones from its facilities because he was an insider threat). ***Also, upon learning of this type of behavior from a selectee, DCMA does not conduct an investigation.*** If the Agency learns of adverse information, which we have in the past, we consider the input and determine if we want to continue with the selection. In this instance, Mr. Borek decided, in conjunction with Ms. Conklin, that the Agency would withdraw the TJO. This is not the first time that this type of situation has occurred. In fact, I can recall multiple incidents when the Agency learned of negative information regarding a selection and then withdrew the TJO." [***EMPHASIS ADDED***]

Maddux's testimony falls flat; her testimony speaks nothing of DCMA's requirement in Business Practice #8 that *documentation* corroborate the removal of a job offer.  DCMA's Business Practice #8 does not include hearsay.  Her statement that "In fact, I can recall multiple incidents when the Agency learned of negative information regarding a selection and then withdrew the TJO" is conclusory, vague, and is not supported by any evidence.  Maddux's statement does not preclude her interaction and involvement in this conspiracy.

*3.2.2.2.*          OPM makes it clear that negative information *must* be more than hearsay.  Negative information regarding an applicant's former work history is easily discovered if the applicant worked for the Federal Government, as that information is recorded in the Employee's Official Personnel File (EOPF), which is transferrable from one agency to another.  It is clear that DCMA received *no* derogatory information from DLA regarding the plaintiff's work performance or reviews.  The gaining agency sees exactly what is contained in an EOPF.  The plaintiff's EOPF contains no negative or derogatory information.  No legitimate agency could possibly evaluate an applicant based on hearsay, yet that is precisely what DCMA did, acting solely on *underdocumented hearsay* from the plaintiff's former supervisor.  In this case, the accusations Wait made would be easily traceable, as the type of accusations he made would have been recorded.  No such records exist.  Additionally, a statement Maddux makes about DCMA not being required to perform an investigation contradicts the hiring process.  The hiring process *is*, at its very nature, an investigation into a person's background, suitability for employment, trustworthiness, and character.

*3.2.2.3.*          Hiring a prospective employee involves investigating an applicant, and Maddux herself states, "If the Agency learns of adverse information, which we have in the past, we *consider* the input and determine if we want to continue with the selection."  Maddux is completely silent about the requirement for *adverse documentation* specified in DCMA's business practices.  Fortunately, OPM has codified hiring procedures, DCMA has adopted them, and Maddux claims that DCMA followed them.  DCMA's Business Practice #8 was included as an exhibit from DCMA, and it is clearly evident that DCMA did *not* follow their own procedures.

*3.2.2.4.*          Article 5 of DCMA Business Practice 8 is the point of focus, which the plaintiff quotes:

"5. ***Upon review of supporting documents***, FSC will determine if the justification is valid.  If it is valid, FSC will submit an action memorandum along with the selecting official's request to withdraw the job offer to the Director, FSC for signature on tentative job offer withdrawals."  [***Emphasis added***]

Article 5 states "*Upon review of supporting documents*."  Mr. Borek's testimony is that he offered the plaintiff the job on 25 March 2019, and then withdrew the job offer hours later – however, it is clear from the written statements made by Borek, Maddux, Conklin, Spears, and Harding that *there were no documents involved*.  Borek made his decision based solely on a telephone conversation.  As a matter of law, the Administrative Procedures Act, 5 USC 702 – 706, applies easily, since DCMA clearly states in its written procedures that *a review of supporting documents is required to withdraw a job offer*.  DCMA violated OPM's and its own hiring procedures.

***3.2.2.5.***        Plaintiff argues that this evidence establishes the second requirement, and that each person knowingly contributed to the goal:  to ensure that the plaintiff was not hired.

***3.2.3.***  THIRD:  The conversation between Wait and Borek was fraudulent.  Mr. Borek is on record for having made contradictory statements.  In his first piece of testimony, he stated that he wanted to contact the plaintiff's former supervisor about the plaintiff's knowledge of artificial intelligence after the second interview on 12 March 2019.  Yet, in Mr. Borek's second, contradictory piece of testimony, he omits *any* mention of discussing artificial intelligence with Mr. Wait on 25 March 2019, instead stating that he wanted to discuss the plaintiff's work record.  Mr. Borek had an agenda – not to follow OPM's rules and regulations regarding the 'Dos and Do Nots Regarding Reference Checking.'  DCMA is culpable for failing to abide by OPM's and DCMA's hiring rules.

*3.2.3.1.* One cannot assume that Mr. Borek's actions were innocent, despite Mr. Wait choosing not to disclose the fact that the plaintiff had filed an EEO complaint against DLA. The plaintiff had revealed that information to the Army Servicing Center at Fort Riley, Kansas on 25 March 2019 – the proper conduit at that point. Wait was aware of the EEO filing and wanted to ensure that the plaintiff's job offer was revoked. Borek contacted Wait. Wait provided false information in order to achieve his goal. Borek solicited that information, and then passed it onto his first-line supervisor and a human resources employee, thereby solidifying the agreement to ensure that the plaintiff's job offer was revoked.

*3.2.3.4.* Each named person played a part in this conspiracy, namely Seiling, Wait, Borek, Maddux, Conklin, Harding, and Spears. Each person contributed to the goal, which was to prevent the plaintiff from being hired; therefore, the third requirement, unity of effort, has been met.

*3.2.4.* <u>FOURTH</u>: The primary goal of this conspiracy was to ensure that the plaintiff was not hired. The plaintiff was offered the position, human resources and USA Staffing processed the hiring documents, and then the hiring manager revoked the offer. Mission accomplished – through direct violation of OPM's and DCMA's policies, rules, and regulations. Subsequent goals include promoting a false impression of the plaintiff as a dangerous insider threat (as defined by 32 USC 2204.24) and someone who wrote and placed malicious code (as defined by 18 USC 1030) onto a government information technology network. The plaintiff's offer of employment was revoked; therefore, the conspirators achieved their goal. The fourth conspiracy requirement is now evident. All four requirements have been introduced, cited, evidence presented, and fully met.

*3.2.5.* DCMA violated 5 USC 702 – 706 by failing to adhere to its business practice number 8, which codifies that documentation must accompany adverse information before an action to withdraw a job offer can occur. The story that Wait communicated to DCMA was false. Hearsay

is not evidence, and that is exactly what DCMA used to discredit and revoke the job offer. Testimony from Borek, Maddux, Spears, and Conklin corroborates that DCMA failed to abide by OPM and DCMA hiring rules and regulations, and their testimony easily opens the door to this civil matter under 5 USC 702-706.

**4.  Relief Sought**

*4.1.*     A formal hearing before a United States Federal District Court Judge.

*4.2.*     A jury trial under Federal Rule 38.

*4.3.*     Compensatory damages in the amount of $125,000, which is approximately one year's salary.

*4.4.*     Punitive damages in the amount of $100,000.

*4.5.*     A formal investigation into both DLA and DCMA by the Federal Bureau of Investigation and the United States Department of Justice regarding this matter.

**5.  Conclusion**

*5.1.*     The plaintiff presents this case before the court because employees of the Federal Government failed to perform their official duties according to established, vetted, trusted, and transparent hiring rules and regulations posted not only by the Office of Personnel Management, but by each Federal agency.  When an agency states that they have a set of in-house business rules, it is a simple matter to compare events with those rules.  In this case, it is beyond question that DCMA failed to follow its hiring practices.  A hiring manager who willingly violates OPM rules and regulations and decides to be a maverick is responsible for his or her actions.  There is indisputable evidence that the hiring manager for this position not only had a wanton disregard for

those rules and regulations, but he became a willing participant in a conspiracy designed by employees of another agency to thwart any employment attempt with the Federal Government by the plaintiff.

*5.2.*　　The Federal EEOC Administrative Judge who presided over this gross misrepresentation of justice erred numerous times. He presented his own agenda, ignored the evidence presented by the plaintiff, and drew conclusions based on cases not yet tried in Federal Court. His claims that the plaintiff merited his decision was based on his opinion of what DLA claims as facts not genuinely in dispute – a claim made in the Federal District Court – and which the plaintiff has identified as being quite disputed. The Federal EOC Administrative Judge ostensibly assigned himself as the Federal Judge and tried the plaintiff *ex parte* and *in vacuo*, drawing his own conclusion to how case 3:21cv00288MHL should be tried. However, 3:21cv00288MHL is not the docket before this administrative judge; EEOC Docket 430-2020-00107X *is*. This administrative judge acted unprofessionally and refused to hear the plaintiff's well-structured arguments. The plaintiff is a retired Army officer with 21 years of honorable service and is a 10-point, service-disabled and compensated veteran who is fighting the wrongs imparted to him after he was forced to resign from a position at DLA. DLA and DCMA stomped on the Constitution of the United States by dismissing the plaintiff's Constitutionally-protected rights, and this administrative judge agreed with DLA's and DCMA's actions.

*5.3.*　　It is for these reasons that the plaintiff seeks the relief outlined in Paragraph 4. Plaintiff prays for the relief sought and respectfully requests a hearing and trial to commence as soon as possible.

## CERTIFICATE OF SERVICE

PLAINTIFF STATES FOR THE RECORD TO THISCOURT THAT BY HIS SIGNATURE HE SUBMITS THIS DOCUMENT UNDER PENALTY OF PERJURY AND IS AWARE OF THE PENALTIES FOR MAKING FALSE STATEMENTS UNDER OATH.

PLAINTIFF AFFIRMS THAT HE HAD NO ASSISTANCE FROM ANY ATTORNEY OR OTHER LEGAL REPRESENTATIVE IN PREPARING THIS DOCUMENT.   PLAINTIFF AFFRIMS THAT HE HAS READ AND COMPLIED WITH THE FEDERAL RULES OF CIVIL PROCEDURE.

SIGNATURE OF PLAINTIFF

W. David Jones

PETITIONER PRO SE

18065 Lunde Lane

Rockville, VA 23146-1731

(505) 920 – 5018

wdavidjones101668a@gmail.com

## **CERTIFICATION**

Required by Federal Rule 83.1 (M) for *pro se* litigants.

I declare under penalty of perjury that:

(1) No attorney has prepared, or assisted in the preparation of this document.


  William David Jones              Name of Pro Se Party (Print or Type)


_____ Signature of Pro Se Party Executed on: <u>1 March 2022</u>   (Date)



OR

(2) _____ (Name of Attorney)

_____ (Address of Attorney)

_____ (Telephone Number of Attorney) Prepared, or assisted

in the preparation of, this document. _____ (Name of Pro Se

Party (Print or Type) _____ Signature of Pro Se Party Executed

on: _____ (Date)

**Certificate of Service**

Plaintiff certifies that on 1 March 2022, plaintiff provided / mailed a complete copy of this document to the following addresses as required:

Federal District Court for the Eastern District of Virginia
Suite 3000 Attention: Clerk for Civil Proceedings
701 E Broad St, Richmond, VA 23219

Defense Contract Management Agency
DCMA Central Region, ATTN: DCMA-GC, Mr. Richard Todd
1523 W. Central Road, Building 203
Arlington Heights, IL 60005

Defense Logistics Agency Defense Supply Center, Richmond
Office of the General Counsel
8000 Jefferson Davis Highway
Richmond, VA 23297

Attorney General of the United States
Main Justice Building
10th and Constitution Ave, NW
Washington, DC 20530

United States Attorney for the Eastern District of Virginia
Suntrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219